**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

AMERISURE INSURANCE COMPANY, et al.

       Plaintiffs,

v.                                    Case No: 1:12-cv-24454-CV-UNGARO

ALL COUNTY DRYWALL SERVICE, INC., et al.

       Defendants.

_____/

## LENNAR'S TRIAL MEMORANDUM OF LAW

Defendants, LENNAR HOMES, LLC f/k/a LENNAR HOMES, INC. and U.S. HOME CORPORATION (collectively, "LENNAR"), pursuant to Fed. R. Civ. P. 16, and Local Rule 16.1(j), file their trial memorandum of law and state as follows:

### I.    INTRODUCTION

The declaratory judgment action filed by Amerisure Insurance Company and Amerisure Mutual Insurance Company (collectively, "AMERISURE") requires the Court to determine, as a matter of law, whether AMERISURE has a duty to defend their named insureds[1], (the "SUBCONTRACTORS") in the action brought by LENNAR against the SUBCONTRACTORS in Florida state court.  LENNAR's Amended Counterclaim for declaratory judgment requires the Court to determine, as a matter of law, whether AMERISURE had a duty to defend LENNAR

---

[1]    Amerisure's named insureds are Harrell's Drywall, Inc., All County Drywall Service, Inc., Northeast Drywall Company and B&B Stucco, Inc., and are referred to herein as the SUBCONTRACTORS.

against demands made by homeowners and/or defend LENNAR in certain Class Actions[2] filed against LENNAR.  The issues of law with respect to the duty to defend have been fully briefed by the parties.

Many of the issues of law relevant to the duty to indemnify may be determined upon the Court's entry of orders on the pending Motions for Summary Judgment filed by the parties. However, to the extent certain issues of law are not determined by the Court in its summary judgment rulings, several legal issues will need to be resolved prior to the trial.  Such legal determinations are necessary and will govern the evidence to be presented at trial, the instructions to be given to the jury and the form of the verdict.  Such issues of law are as follows:

A.      The meaning of the term "operations" as used in the Job Site Exception and as used in the Additional Insured Endorsements.

B.      When does "property damage" "occur" under a standard CGL policy under Florida law.

C.      When is "property damage" "sustained within a building" under the Job Site Exception.

D.      Whether LENNAR must allocate the amount of property damage occurring during the SUBCONTRACTORS' operations.

---

[2]      The "Class Actions" consist of the following: *de Gamboa, et. al. v. Knauf Gips KG, et. al.,* Case No. 09-21869 (S.D. Fla. July 6, 2009); *Sean and Beth Payton v. Knauf Gips KG, et. al.,* Case No. 09-7628 (E.D. La. Dec. 9, 2009); *Kenneth and Barbara Wiltz v. Beijing New Building Materials Public Limited Co.,* Case No. 2:2010-CV-00361 (E.D. La. Feb. 10, 2010); *Mary Ann Benes v. Knauf Gips KG, et. al.,* Case No. 2:10-CV-00362 (E.D. La. Feb. 10, 2010); *Joyce W. Rogers v. Knauf Gips KG, et. al.,* Case No. 2:10-CV-00362 (E.D. La. Feb. 10, 2010); *Dean and Dawn Amato, et. al. v. Liberty Mutual Insurance Company, et. al.*,  Case No: 10-932 (E.D. La. March 19, 2010); *David Gross, et. al. v. Knauf Gips, KG, et. al.,* Case No. 09-6690 (E.D. La. March 18, 2010).

E.       Whether the removal and replacement of the damaged Chinese drywall itself constitutes "property damage" under a standard CGL policy if the removal and replacement is necessary to repair the damage to other property.

## II.      ARGUMENT

### A.       "Operations" as used in the Policies should be construed to mean all work the SUBCONTRACTORS performed under their contracts with LENNAR.

LENNAR contends that the term "operations" is ambiguous and thus must be construed in favor of the insureds to mean all work performed by the SUBCONTRACTORS within the community pursuant to their subcontracts[3]. AMERISURE contends that the term "operations" is unambiguous and means all work performed by the SUBCONTRACTORS on each Lennar home.   The term "operations" is not defined in the Policies.   However, the Florida Supreme Court holds that the term "operations" in a commercial liability policy is susceptible of alternative meanings and therefore must be construed broadly in favor of coverage to mean "work done in the performance of [the contractor's] contract with [the owner.]" *Container Corp. of America v. Maryland Cas. Co.*, 707 So. 2d 733, 736-737 (Fla. 1998).  See, *Am. Contractors Ins. Co. Risk Reten'n Group v. Zurich Am. Ins. Co.*, 2011 WI 6065400 *13 (S.D. Fla. 2011)("there is ambiguity in the Policy as to whether operations include the period of time after the subcontractor has finished its work, until the work is accepted"); *Monticello Ins. Co. v. City of Miami* Beach, 2009 WL 667454 *6 (S.D. Fla. 2009)("operations" in AI endorsement is not defined and should be construed broadly in favor of coverage).  See also,  *Liberty Mutual Fire Ins. Co. v. E.E. Cruz & Co.,* 475 F. Supp. 2d 400, 410 (S.D.N.Y. 2007)(use of terms "site of

---

[3]       LENNAR's position regarding interpretation of the term "operations" has been briefed by LENNAR in its previous summary judgment filings, which  LENNAR adopts and incorporates herein. (Dkt. 100, pp. 14-16; Dkt. 119, pp. 16-17; Dkt. 150, pp. 17-18.)

covered operations" and "project" in an AI Endorsement means that property damage must occur before all work under the parties' contract has been completed).

Applying the above authorities, this Court should hold that "operations" as used in the AI Endorsements and in the Job Site Exception means all work performed under the SUBCONTRACTORS' contracts in each community, and not just that SUBCONTRACTORS' work at a particular home.

**B.      Florida follows the "Injury in Fact" rule in determining when property damage occurs under a CGL policy[4].**

LENNAR contends property damage "occurs" when it happens. The plain language of the Policy speaks to the "occurrence" of property damage, not its discovery. Often, property damage is discovered at the same time that it occurs. However, in this case, the property damage was latent. The damage was sustained before it was discovered. The best reasoned authority concerning when latent property damage "occurs" is binding precedent from the Eleventh Circuit. *Trizec Properties, Inc.  v. Biltmore Construction Co., Inc.*, 767 F. 2d 810 (11th Cir. 1985). The Court should follow the Eleventh Circuit's decision in *Trizec Properties* and interpret the policy according to its plain language.

In Florida, an insurance policy must be construed in accordance with the plain meaning of the words used in the policy. *State Farm Mutual Auto Ins. Co. v. Menendez,* 70 So.3d 566 (Fla. 2011). (See, Dkt. 172-3, p. 26) The plain language of the Policies defines "property damage" as "physical injury to tangible property" caused by an "occurrence" during the policy period. There is no requirement in the Policy that property damage be "manifest" or "discovered" in order for there to be coverage, as argued by AMERISURE in this case.

---

[4]      LENNAR's position regarding when "property damage" "occurs" under a standard CGL policy is discussed in several memoranda on file and has been fully briefed to the Court. (Dkt. 100, pp. 16-17; Dkt. 119, pp. 12-15; Dkt. 133, pp. 9-10; Dkt. 150, pp. 12-17; Dkt. 174, pp. 7-9; Dkt. 178, pp. 3-4)

Despite the plain language of the insurance policy, some Florida courts have incorrectly implied a discovery requirement.   This misinterpretation of Florida law stems from *Travelers v. Gayfers,* 366 So.2d 1199 (Fla. 1st DCA 1979) where the court stated "occurrence is commonly understood to mean the event in which negligence manifests itself in property damage." However, *Gayfers* did not involve latent or gradual damage occurring over time.   Rather, in *Gayfers,* a pipe burst causing immediate damage. *Id.*   The holding in *Gayfers* is that a negligent act within the policy period was not sufficient to trigger coverage unless there was also property damage during the policy period. *Id. Gayfers* is the only Florida state court case that has ever even mentioned "manifestation" of damage as a requirement for coverage.   The Florida Supreme Court has never ruled on this issue.

Following *Gayfers*, *Trizec Properties* was decided by the Eleventh Circuit.   In *Trizec Properties*, the Eleventh Circuit concluded that the injury in fact trigger theory applies in Florida. 767 F.2d 810 (1985).   *Trizec Properties* rejected a manifestation trigger stating, "In essence, [the insurer] is attempting to change the present policy into a 'claims made' policy where the date of discovery of the damage is relevant.   The language of the policy, however, clearly focuses on the date that damage is sustained and not the date it 'manifests' itself." *Id.* at 813.

Contrary to the Eleventh Circuit's holding in *Trizec Properties*, *Auto Owners Ins. Co. v. Travelers Cas. & Surety Co.,* 227 F.Supp.2d 1248, 1266 (M.D. Fla. 2002) applied the label "manifestation" to describe the property damage trigger used in Florida and engrafted a "discovery" requirement onto the plain meaning of an "occurrence" of "property damage."   A handful of district court decisions followed suit, relying on *Gayfers* and *Auto Owners Ins. Co.* to imply a discovery requirement to trigger coverage.   *See e.g., Mid-Continent Cas. Co. v. Siena Home Corp.,* 2011 WL 2784200 (M.D. Fla. 2011); *Mid-Continent Cas. Co. v. Frank Casserino*

*Const., Inc.* 721 F.Supp.2d 1209 (M.D. Fla. 2010); *Assurance Co. of America v. Lucas Waterproofing Company, Inc.,* 581 F.Supp.2d 1201 (S.D. Fla. 2008); *Essex Builders Group, Inc. v. Amerisure Ins. Co.,* 485 F.Supp.2d 1302 (M.D. Fla. 2007).

However, the *Gayfers* court did not actually hold that the "manifestation" trigger theory requiring discovery applied in Florida. Furthermore, *Auto Owners Ins. Co.* relies on *Trizec Properties* for the proposition that the damage itself must occur during the policy period, but then inexplicably looks to an Alabama case that misinterpreted *Gayfers* as holding that in Florida the manifestation trigger theory applies if damage is continuously occurring. *Auto Owners Ins. Co.,* 227 F.Supp.2d at 1266. This set in motion much confusion in the cases that followed with regard to the meaning of the trigger labels that were being applied. See*, Siena Home Corp.,* 2011 WL 2784200 *3 (M.D. Fla. 2011)(purports to apply "manifestation" trigger theory but notes that the meaning of "manifestation" is a subject of disagreement and debate); *Frank Casserino Const., Inc.* 721 F.Supp.2d at 1216-1217 (uses term "manifest" but appears to apply injury in fact trigger by holding that discovery is not required to trigger coverage, and/or arguably adds another layer of complexity by implying that coverage is triggered when property damage is "discoverable" or "visible" even if damage is concealed and unknown); *Lucas Waterproofing Company, Inc.,* 581 F.Supp.2d at (citing to *Auto Owners Ins. Co.,* but holding that "*assuming without deciding* that the manifestation trigger applies, there is an issue of material fact preventing summary judgment") *emphasis added* (S.D. Fla. 2008); *Essex Builders Group, Inc.,* 485 F.Supp.2d 1309-1310 (cites to *Auto Owners Ins. Co.,* but holds ultimately that regardless of whether manifestation or injury in fact trigger applies, an issue of fact precluded summary judgment).

6

Fortunately, a recent case decided in the Middle District of Florida carefully examines the case law, sorts through the confusion and clarifies that the injury in fact theory is the applicable trigger theory in Florida.    *See, Axis Surplus Ins. Co. v. Contravest Construction Co.,* 2012 WL 2048303 (M.D. Fla. 2012).  In *Axis Surplus,* the Court explained that district courts suggesting a "manifestation" rule in Florida misinterpreted the source case, *Gayfers*. *Id.* at 1346-1347.  *Axis Surplus* recognizes that when damage "occurs" was not before the court in *Gayfers*,  but rather, the only issue was whether a negligent act alone is sufficient to trigger coverage.  *Id.*  at 1347.  The Court further explained that *Trizec Properties,* unlike *Gayfers,* did address the issue of when damage occurs in order to trigger coverage under a standard CGL policy.  *Id.* at 1348.  *Axis Surplus* recognized that *Trizec Properties* held that the injury in fact trigger applies in Florida. *Id.*  *Axis Surplus* ultimately concludes, after a thorough examination of the case law, that the policy language and the binding precedent in *Trizec Properties* requires that the injury in fact trigger theory be applied in Florida. *Id.* at 1349.  *See also,* K. Kelly, *The Manifestation Rule in Florida: Has Death Knelled?* 87 *Fla. Bar Journal* 23, 30 (July/August 2013)(CGL policy language and plain language rule requires application of the injury in fact trigger theory in Florida).

The Texas Supreme Court case, *Don's Bldg. Supply Inc. v. One Beacon Ins. Co.*, 267 S.W. 3d 20 (Tex. 2008), sets out a well reasoned argument for applying an injury in fact trigger theory.  Like Florida, Texas courts hold that an insurance policy must be interpreted according to its plain language.  *Id.* at 23.   The Court in *Don's Bldg. Supply,* examined policy language identical to the policy language in this case and concluded that property damage occurs under the policy when actual physical damage to the property occurs. *Id.* at 24.  The Court also observed that some decisions cited for following the manifestation rule do not actually follow the

manifestation rule as opposed to the actual injury rule, noting that the *Gayfers* decision in Florida was an example of one such case.  *Id.* at 27 n. 9.  The Court also concludes, as the Eleventh Circuit did in *Trizec Properties,* that engrafting a manifestation requirement to limit coverage would blur the distinction between an occurrence based policy and a claims made policy. *Id.*  at 29.  The Texas Supreme Court ultimately adopts the injury in fact trigger theory stating, "The policy asks when damage happened**,** not whether it was manifest, patent, visible, apparent, obvious, perceptible, discovered, discoverable, capable of detection, or anything similar. Occurred means when *damage* occurred**,** not when *discovery* occurred." *Id.*

Moreover, it appears from the case law that AMERISURE is unclear regarding the trigger theory applicable  in Florida.  For example, in *Essex Builders Group, Inc. v. Amerisure Ins. Co.,* AMERISURE argued that damage "occurred" under its policy when the damage actually happened. *Id.* at 1309-1310.   The Court noted that "Amerisure has not expressly addressed the "trigger of coverage" issue. Rather the insurer seemingly assumes that the injury-in-fact trigger theory applies." *Id.*  Ultimately, the *Essex Builders Group* court held that summary judgment should not be entered against AMERISURE.  *Id.*  In so holding,  the Court stated, "Alternatively, if the injury-in-fact trigger theory applies, as Amerisure points out, there are still unresolved issues of fact concerning whether the property damage occurred during the term of the Amerisure policy." *Id.*

In Florida, an insurance policy is construed according to its plain language. The plain language of the Policy does not require that property damage be discovered within the policy period, only that it "occur" during the policy period.  Therefore, this Court should apply the injury in fact trigger theory to determine when property damage occurs under the Policies.

**C. Consistent with the injury in fact trigger theory, property damage is "sustained within a building" under the Job Site Exception when the property damage first occurs.**

LENNAR contends that "sustained within a building" means when property damage first occurred as a matter of fact whether or not it was discovered or discoverable by LENNAR. AMERISURE contends that "sustained within a building" means when property damage was first discovered by LENNAR. AMERISURE's argument is inconsistent with the plain language of the Job Site Exception and is contrary to Florida law.

Florida insurance contracts are interpreted according to their plain meaning. *State Farm Mutual Auto Ins. Co.,* 70 So.3d 566. The plain language of the Job Site Exception does not require that damage be discovered during the SUBCONTRACTORS' "operations." The Job Site Exception provides only that property damage be "sustained within a building." AMERISURE argues that the manifestation doctrine defeats the Job Site Exception. However, as discussed above, the proper trigger theory in Florida is the injury in fact theory.

Under the plain meaning of the words used in the Job Site Exception, to "sustain" an injury or loss means to "suffer or undergo" such loss. See, "Sustain" *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 25 Oct. 2013. http://www.merriam-webster.com/dictionary/sustain Certainly, one can "sustain" a loss or injury without being aware of it. AMERISURE provides no basis for engrafting a discovery requirement onto the plain language in the Job Site Exception. When damage "occurs" under a standard CGL policy and when damage is "sustained" under the Job Site Exception should be interpreted consistently by this Court in accordance with the plain language of the policies. LENNAR intends to prove at trial that damage from Chinese drywall is sustained immediately upon exposure and thus the Job Site Exception is applicable. (Dkt. 119)

**D.      Once AMERISURE's policies are triggered, AMERISURE is liable for all damage flowing from the occurrence, and LENNAR is not required to allocate the amount of the property damage that occurred during the SUBCONTRACTORS' ongoing operations.**

Property damage from Chinese drywall is gradual and continuing.  The evidence at trial will show that irreversible damage starts almost immediately upon installation of the drywall. The fact that the condition of the damaged property set in motion during the SUBCONTRACTORS' "operations" worsens over time is not relevant to the question of which policy provides coverage for the resulting damages.  Once a CGL policy is triggered by an "occurrence" within the "policy period," all "property damage" flowing from such occurrence is covered up to the limits of the policy in place at the time such "property damage" first occurred. AMERISURE contends that LENNAR must allocate the discrete portion of its damage that occurred during the SUBCONTRACTORS' ongoing operations in order to prevail. AMERISURE's argument is contrary to the plain language of the policy.

The insuring agreement provides that AMERISURE will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  (See, e.g., Dkt. 1-14, p. 7)  Further, the policies state that "This insurance applies to 'bodily injury' and 'property damage' only if: The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the coverage territory"; and, "The 'bodily injury' or 'property damage' occurs during the policy period."  (See, e.g., Dkt. 1-14, p. 7)  "Property damage" as defined in the Policy means "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of physical injury that caused it."  (See, e.g., Dkt. 1-14, p. 20)  "Occurrence" means "an accident, including continuous or repeated exposure to conditions, which result in

10

Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured."  (See, e.g., Dkt. 1-14, p. 20).

Thus, an insurer is responsible to pay all sums the insured becomes legally obligated to pay as damages caused by an "occurrence" of property damage within the policy period.  Once there is an "occurrence" of property damage triggering the policy, all property damage flowing from that occurrence is covered by the policy. *See, American Fire Ins. Co. v. B & L Trucking and Const. Co., Inc.,* 951 P.2d 250, 256 (Wash. 1998)("We hold that once a policy is triggered, the policy language requires insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits.  Once coverage is triggered in one or more policy periods, those policies provide full coverage for all continuing damage, without allocation between insurer and insured."); *Aerojet-General Corp. v. Transport Indem. Co.,* 70 Cal.Rptr.2d 118, 128 (Cal. 1997)(duty to indemnify for all sums insured becomes legally obligated to pay extends to all specified harm caused by an occurrence, even if some such harm results beyond the policy period).

LENNAR will prove that corrosion to metal components caused by Chinese drywall begins to occur immediately upon installation and continues gradually until the Chinese drywall is removed. (Dkt. 117)  The property damage found in the homes flows from the initial property damage caused by the Chinese drywall, which damage occurred at the time of installation. (Dkt. 117)  LENNAR intends to present evidence of the damage found by LENNAR's consultant, ENVIRON, when it investigated home owner complaints, and expert testimony as to when that damage first began.  LENNAR further intends to introduce evidence that the steps taken to repair the homes were necessary once the corrosion began, because such corrosion would continue until the defective Chinese drywall was removed.

AMERISURE argues that because the Job Site Exception requires that damage must occur during the SUBCONTRACTORS' operations, and the AI Endorsement is limited to the SUBCONTRACTORS' "ongoing operations," that LENNAR must allocate the amount of property damage that occurred during this limited time frame in order for LENNAR to recover. (Dkt. 159; Dkt 172-4 p.2; Dkt 172-8 p.2)[5] This is not consistent with the law regarding the obligations of an insurer once an insurance policy is triggered.  If the AMERISURE policies are triggered by property damage occurring during the SUBCONTRACTORS' operations, then AMERISURE is responsible for all damages flowing from the initial injury, even if those damages continue over time.  AMERISURE has not offered any legal support for its contention that LENNAR must allocate the portion of the property damage that occurred during the SUBCONTRACTORS' operations.

LENNAR acknowledges that in certain situations involving continuous damage over time, where there are multiple insurers on the risk, the Courts have allocated damages on a pro-rata basis.  *See, e.g. Domtar, Inc. v. Niagara Fire Insurance Co.,* 563 N.W.2d 724 (Minn. 1997)(court allocated all damages incurred by insured in pollution contamination case among the insured for self insured time periods, and multiple insurers on the risk in different policy periods equally from 1933 through the year of clean-up efforts).  However, this type of allocation is only employed where there are multiple insurers on the risk over an extensive period of years.  In the instant case, although there may be continuing damage over time, there are no periods of "self-insurance" and there are not multiple insurers on the risk.  Further, there is nothing to indicate

---

[5]     Amerisure's proposed jury instructions and verdict form require a finding by the jury that Lennar has proven the amount / allocation of property damage that occurred during the Subcontractors' operations in order for Lennar to prevail.

that Florida courts would allow an allocation in this manner.  Rather, as set out above, Florida courts determine which policy period covers a claim by applying the injury in fact trigger theory.

The plain language of a standard CGL policy states that the insurer is required to pay "all sums" the insured is legally obligated to pay.  Thus, the general rule is that once a policy is triggered, the insurer must pay "all sums" the insured becomes legally obligated to pay even if those damages continue past the policy period.  As one commentator explained, this principal is easily demonstrated by the standard insurance coverage action.

> For example, assume a policyholder's truck driver runs a red light and collides with another car, whose driver sues. The claim is covered under the policyholder's CGL because the injured driver is claiming actual injury resulting from a covered occurrence (employee negligence) that was allegedly inflicted on the third party claimant during the policy period. However, as we all know, the bodily injury damage to the third party claimant may extend for years past the termination of the policy period during which the auto accident took place. If the claimant was seriously injured (e.g., confined to a wheelchair), the damages from the covered occurrence could extend for decades. No CGL insurer involved in this situation would assert that its coverage responsibility ceased at the conclusion of the policy period. The insurer would, quite rightly, continue to pay medical bills, economic loss, pain-and-suffering, and other valid damages so long as the policy limits had not been exhausted.

Jeffrey W. Stempel, *Domtar Baby: Misplaced Notions of Equitable Apportionment Create A Thicket of Potential Unfairness for Insurance Policyholders*, 25 Wm. Mitchell L. Rev. 769, 825-26 (1999)

The general rule is that the insurer is responsible for all damages that proximately flow from an injury beginning during the policy period. *Id.* at 830.  CGL coverage is triggered by a claim of negligence-induced injury that took place during the policy period.  *Id.* at 834.  If the damages from the injury continue beyond the policy period, the insurer remains responsible. *Id. See also, Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001)(Liability coverage for all sums caused by an occurrence required the excess insurer to indemnify the insured for all sums

as a result of that occurrence, subject to the policy limits, whether or not the damaging effects of the occurrence continued beyond the end of the policy period); *See, Champion Dyeing & Finishing Co., Inc. v. Centennial Ins. Co.,* 810 A.2d 68, 76 (Sup. Ct. N.J. 2002)(insurer has an obligation to indemnify for subsequent damage attributable to an injury occurring during the relevant policy period, even if the damage extends beyond the policy term); *Monsanto Co. v. C.E. Heath Comp. & Liab. Ins. Co.*, 652 A.2d 30, 35 (Del. 1994)(Once a policy is on the risk, the unambiguous policy language requires the insurance company to pay "all sums" for which the policyholder shall become liable, up to the policy limits."); *Owens-Corning Fiberglas Corp. v. Am. Centennial Ins. Co.*, 660 N.E.2d 770 (C.P. 1995)(once policy is triggered for an asbestos claim because of some injury during the policy period, such policy covers the entire ongoing injury); *Stonewall Ins. Co. v. City of Palos Verdes Estates*, 54 Cal. Rptr. 2d 176, 201, (2d Dist. 1996), as modified, (July 19, 1996)("once an injury triggers coverage, according to the language (in a) … standard CGL policy, the insurer must indemnify the insured for 'all sums' which the insured becomes obligated to pay, whether during the period of the policy issued by that insurer or after; the policy language does not limit the insurer's liability to all sums which the insured becomes liable to pay during the policy period"); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 41, 626 A.2d 502, 508 (1993)("In other words, once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk. The insurer in question must bear potential liability for the entire claim.")

There is no authority that supports AMERISURE'S contention that LENNAR must prove and/or allocate the portion of the property damage that occurred during the SUBCONTRACTORS' operations in order to recover.  If LENNAR proves that property

damage occurred during the SUBCONTRACTORS' operations during a covered policy year, then AMERISURE is responsible for all damages flowing from the initial injury, even if those damages occurred gradually over time.

     **E.**     **If the removal and replacement of the damaged Chinese drywall itself was necessary to repair the damage to other property, then such removal and replacement constitutes part of the covered cost to repair "property damage" under a standard CGL policy.**

LENNAR acknowledges that *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 889 (Fla. 2007) holds that damage to the defective work itself is not "property damage" under a standard CGL policy. However, no Florida court has yet ruled on whether a standard CGL policy covers the costs attributable to "ripping and tearing out" defective work to "get to" damage to other property. Courts in other states have found that these damages are covered as part of the cost to repair damage to other property. *See Riverfront Landing Phase II Owners' Ass'n v. Assurance Co. of Am.*, No. C08-0656RSL, 2009 WL 1952002 at *6 (W.D.Wash. July 6, 2009)(cost to remove and repair insured's work to "get to" and repair resultant damage is covered consequential damages); *Mut. of Enumclaw Ins. Co. v. T & G Constr., Inc.*, 199 P.3d 376, 385 (Wash. 2008)(removal and replacement of poorly installed siding necessary to remedy underlying water intrusion damage was covered property damage).

Lennar will present evidence that in conducting the necessary repairs, it was necessary to remove the Chinese drywall to gain access to the damaged other property, and that it was then necessary to replace the drywall to complete the repairs. Under these circumstances, the costs to remove and replace the drywall itself should be covered as a necessary part of the cost to repair covered "property damage."

## III.    CONCLUSION

The Court's determination of the issues of law described above will govern the trial of this matter.  The Court should find as a matter of law that "operations" as used in the Job Site Exception and the AI Endorsements at issue is ambiguous and thus must be interpreted in favor of the insured.  Further, the injury in fact trigger theory applies in Florida and governs when "property damage" occurs under a standard CGL policy. Once an AMERISURE policy is triggered, that policy provides full coverage for all continuing damage, and LENNAR is not required to allocate the amount of property damage occurring during the SUBCONTRACTORS' operations.  Finally, if the removal and replacement of the Chinese drywall itself was necessary to repair the damage to other property then it is part of LENNAR'S covered costs.

Respectfully submitted,

BARNETT, BOLT, KIRKWOOD
LONG & MCBRIDE

/s/Charles A. Carlson
Charles A. Carlson, Esq.
Florida Bar # 716286
Amy E. Stoll, Esq.
Florida Bar #150959
601 Bayshore Boulevard, Suite 700
Tampa, Florida  33606
(813) 253-2020/(813) 251-6711-Facsimile
ccarlson@barnettbolt.com
astoll@barnettbolt.com

Attorneys for Lennar Home, LLC and
U.S. Home Corporation

## <u>Certificate of Service</u>

I hereby certify that on this 25th day of October, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/Charles A. Carlson

bbkldocs-#708346-v1-reply_to_amer__opp__to_msj_on_ai.doc

17